

FILED by____**KS**____ D.C.

**Apr 28, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **22-20173-CR-ALTONAGA/TORRES**
_____

18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 1956(h)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

UNITED STATES OF AMERICA

vs.

LUIZ CARLOS CAPUCI JR.,
        a/k/a "Junior,"
        a/k/a "Junior Caputti,"
        a/k/a "Junior Capuci,"
        a/k/a "Capuci,"

        Defendant.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Entity

1.      Mining Capital Coin, a/k/a "MCC International Corp.," a/k/a "Mining Capital Coin

Corp." (collectively referenced herein as "MCC") was founded in Florida in or around November

2017, and purported to have headquarters across the world including in Brazil, China, Japan,

Kenya, Nigeria, Philippines, South Korea, Uganda, and the United States. Among other locations

within the United States, MCC purportedly maintained offices in Miami, Florida, and Port St.

Lucie, Florida, within the Southern District of Florida.

2.      MCC claimed to operate a cryptocurrency investment platform and network of cryptocurrency mining machines, and touted its various investment programs through social media, video conference calls, and in-person events.  MCC conducted its business principally by means of websites accessible at www.miningcapitalcoin.com and www.mcctradingbot.com (the "MCC Websites"). MCC communicated with investors and prospective investors through online platforms such as YouTube and Facebook. The MCC Websites were accessible worldwide to the public, including to individuals within the Southern District of Florida.

### Individuals

3.      Defendant, **LUIZ CARLOS CAPUCI JR., a/k/a "Junior," a/k/a "Junior Caputti," a/k/a "Junior Capuci," a/k/a "Capuci,"** was an individual who resided in Port St. Lucie County, Florida. **CAPUCI** was the Founder, CEO, and President of MCC.  **CAPUCI** managed and controlled MCC and controlled a purported cryptocurrency exchange by the name of Bitchain Exchanges.

4.      Co-Conspirator-1 ("CC-1") served as the Vice President and Marketing Director of MCC and promoted MCC through webinars and in-person meetings around the world.

### Terms

5.      Capital Coin, or "CPTL," was MCC's cryptocurrency.  According to a White Paper issued by **LUIZ CARLOS CAPUCI JR.,** Capital Coin was a decentralized autonomous organization, or "DAO," which was purportedly "stabilized by revenue from the biggest cryptocurrency mining operation in the world."

6.      Bitchain Exchanges was purportedly a cryptocurrency exchange independent of **LUIZ CARLOS CAPUCI JR.**  According to its marketing materials, Bitchain Exchanges was an exchange platform that held Capital Coin, MCC's cryptocurrency.

7.      **LUIZ CARLOS CAPUCI JR.** directed MCC's international network of affiliates,

promoters, and employees. **CAPUCI** and his co-conspirators disseminated marketing information regarding MCC's various investment programs, via wire communications in the United States and globally, to MCC's network of promoters and affiliates and to the investing public. As a result of these marketing efforts, **CAPUCI** caused thousands of investors worldwide to invest in MCC's cryptocurrency investment programs.

8.      The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for enforcing federal securities laws and promulgating rules and regulations in keeping the same.

9.      A "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when they offered and sold securities to the public, absent certain specified exemptions.

10.      A "digital asset" or "digital token" was generally referred to as an asset issued and/or transferred using a distributed ledger or blockchain technology, including assets referred to as "cryptocurrencies," "virtual currencies," "digital coins," and "digital tokens."

11.      The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.

12.      Blockchain analytics referred to the application of investigative tools and techniques to the blockchain in order to trace and track cryptocurrency transactions.

13.      "Bitcoin" was a type of cryptocurrency. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be

used for purchases or exchanged for other currency on currency exchanges. Bitcoin was commonly known as "BTC."

14.    A "trading bot" was a computer software programmed to trade a digital asset based upon predetermined parameters.

15.    A "cryptocurrency wallet" was a digital wallet used to store, send, and receive digital currency like Bitcoin. Each digital wallet had a unique digital address containing letters and numbers that were used to send and receive cryptocurrency transactions.

16.    A "cluster" referred to a collection of related cryptocurrency wallets or addresses usually under the control of a single entity or affiliated individuals.

17.    "Cryptocurrency mining" was the process that Bitcoin and other cryptocurrencies used to generate, or "mine," new coins and verify new transactions. Cryptocurrency mining involved vast decentralized networks of computers, sometimes referred to as "mining machines," around the world that verified and secured blockchains. In return for contributing their processing power and verifying transactions, computers on the network could be rewarded through newly created cryptocurrency.

18.    A decentralized autonomous organization, or "DAO," was software that ran on a blockchain and offered users a built-in model for collective management of its code. Unlike traditional organizations, DAOs relied on a set of rules written down in computer code, which were enforced by the network of computers running a shared software.

**COUNT 1**
**Conspiracy to Commit Wire Fraud**
**(18 U.S.C. § 1349)**

1.    The General Allegations section of this Indictment is hereby realleged and incorporated by reference.

2.     From in or around 2017, and continuing through in and around the date of this Indictment, in Miami-Dade, Broward, and St. Lucie Counties, in the Southern District of Florida, and elsewhere, the defendant,

**LUIZ CARLOS CAPUCI JR.,**
a/k/a "Junior,"
a/k/a "Junior Caputti,"
a/k/a "Junior Capuci,"
a/k/a "Capuci,"

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, and agree with CC-1 and with others known and unknown to the Grand Jury, to knowingly, and with the intent to defraud, devise, and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendant and his co-conspirators to unjustly enrich themselves by: (a) inducing investors to invest with MCC through materially false and fraudulent pretenses, representations, and promises as to the use of investment funds, the technical abilities of MCC to generate profits through mining operations, cryptocurrency trading and investment activity, and the return on investment on funds invested with MCC; (b) selling unregistered securities to unqualified investors; (c) diverting investors' funds to cryptocurrency wallets and financial accounts under their control; and (d) concealing the misappropriation of investor funds for their own personal use and benefit.

**Manner and Means of the Conspiracy**

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, but were not limited to, the following:

**Formation and Management of Mining Capital Coin**

4.    In or around late 2017, **LUIZ CARLOS CAPUCI JR.** and CC-1 created MCC. From the beginning, **CAPUCI** and CC-1 aggressively marketed MCC to prospective investors as a lucrative investment opportunity.   **CAPUCI** and CC-1 falsely and fraudulently touted MCC's purported investment programs involving cryptocurrency mining, cryptocurrency trading, and other investment activity, including foreign exchange trading.

5.    As a result of **LUIZ CARLOS CAPUCI JR.** and his conspirators' material misrepresentations regarding MCC and its investment programs, from in or around 2017, to the date of this Indictment, **CAPUCI**, CC-1, and MCC falsely and fraudulently obtained approximately $62 million from retail investors around the world, including retail investors based in the Southern District of Florida.

6.    **LUIZ CARLOS CAPUCI JR.** and CC-1 conducted presentations at various events in the Southern District of Florida and around the world to promote MCC's cryptocurrency mining capabilities, investment programs, and the purported returns that prospective investors could earn from investing with MCC.

7.    At these events, **LUIZ CARLOS CAPUCI JR.** and CC-1 also recruited promoters and affiliates to promote MCC and its various investment programs through a multi-level marketing scheme, or "pyramid scheme." As part of the recruitment effort, **CAPUCI** relied on individuals—known as "leaders"—to solicit investors and enticed these leaders with additional prize incentives.  For example, for successfully luring investors to invest with MCC, **CAPUCI** promised MCC's network of leaders a range of gifts from Apple watches and iPads to luxury vehicles such as a Lamborghini, Porsche, and even **CAPUCI's** personal Ferrari.

**MCC's Fraudulent Investment Program Involving "Mining Packages"**

8.      **LUIZ CARLOS CAPUCI JR.** and CC-1 aggressively touted and falsely and fraudulently marketed MCC's purported network of cryptocurrency mining facilities to prospective investors despite knowing that the marketing materials contained multiple false and fraudulent statements.  For example, **CAPUCI** represented that MCC had "technological mining facilities with the best equipment on the market located in the United States," including facilities based in the Southern District of Florida, when **CAPUCI** then and there knew that MCC was not operating such mining facilities, let alone using the best mining equipment in the United States.

9.      To persuade investors to invest, **LUIZ CARLOS CAPUCI JR.** and CC-1 posted videos to social media that were accessible to prospective investors in the Southern District of Florida and elsewhere regarding MCC's purported network of mining machines, including the following:

    a.      On or about September 28, 2018, MCC published a video to the internet via a social media platform that purported to show MCC's mining operations in the Southern District of Florida.  During the video, **CAPUCI** filmed a room containing what appeared to be numerous mining machines in operation.  **CAPUCI** then stated, "you guys like the noise? It's mining, it's mining, making money for you guys."  Later he stated, "I didn't spend money to go to Africa, Nigeria, or whatever, to do a Ponzi scheme," and falsely claimed to have seven other offices where MCC conducted mining as well.

    b.      On or about December 26, 2018, MCC published a video to the internet via a social media platform regarding MCC's mining operations in the Southern District of Florida. During the video, CC-1 explained that MCC's mining machines "[were] mining right now, alright, all the time for you...MCC working with the investments, working with the money, working with your money, making your money work for you."

10.      To share in these purported mining profits, **LUIZ CARLOS CAPUCI JR.** and CC-1 falsely and fraudulently offered and marketed MCC's "Mining Packages" as a lucrative investment opportunity.  To participate as an investor, individuals were required to purchase a

"Mining Package," with options ranging from approximately $125 to $1.2 million plus a $50 fee to open the account.

11.    Upon purchasing such a package, **LUIZ CARLOS CAPUCI JR.** promised investors a weekly return based on the amount of the package, to be distributed automatically and bi-monthly to the investors' cryptocurrency wallets.

12.    **LUIZ CARLOS CAPUCI JR.** controlled and held investors' wallets within MCC's online investment platform, known as the "MCC Back Office." **CAPUCI** and his conspirators falsely and fraudulently represented to investors that they could request withdrawals of their earnings subject to certain limited restrictions and delays.

13.    **LUIZ CARLOS CAPUCI JR.** offered and sold the Mining Packages as a series of transactions or schemes because **CAPUCI** promoted the Mining Packages as an investment of money into a common enterprise with other investors, with the reasonable expectation of profits from the efforts of MCC. The Mining Packages therefore qualified as "securities" under the rules and regulations governing the offer and sale of securities in the United States and required registration with SEC.

14.    **LUIZ CARLOS CAPUCI JR.** never registered MCC's investment program involving "Mining Packages" as an offering and sale of securities with the SEC; nor did **CAPUCI** have a valid exemption from this registration requirement.

15.    Contrary to **LUIZ CARLOS CAPUCI JR.'s** representations to investors, MCC was not operating a large network of cryptocurrency mining machines to generate returns for investors. Instead, **CAPUCI** was operating an illicit investment scheme in which he was falsely and fraudulently diverting investors' funds to cryptocurrency wallets and financial accounts under his control and not investing the funds in MCC's operations as he had falsely represented to his investors.

16.    To further entice investors to invest in MCC's purported cryptocurrency mining operation, **LUIZ CARLOS CAPUCI JR.** published a White Paper regarding Capital Coin, MCC's cryptocurrency. In this White Paper, **CAPUCI** falsely described Capital Coin as a

decentralized autonomous organization, or DAO. Further, **CAPUCI** falsely and fraudulently stated that Capital Coin was stabilized by revenues generated from MCC's cryptocurrency mining business.

<strong>MCC's Fraudulent Investment Program Involving MCC's Trading Bots</strong>

17.     Beginning in or around 2019, **LUIZ CARLOS CAPUCI JR.** and CC-1 also aggressively touted and falsely and fraudulently marketed MCC's purported "Trading Bots" as an additional investment mechanism for investors. **CAPUCI** and CC-1 misled the public by stating that MCC offered, owned, and controlled Trading Bots that could generate significant profits for prospective investors in the cryptocurrency trading market.

18.     As part of its marketing message to the public, **LUIZ CARLOS CAPUCI JR.** stated that trading bots then available on the market were not generating "positive results." In contrast, **CAPUCI** claimed that MCC joined with "top software developers in Asia, Russia, and the U.S.A. to create an improved version of Trading Bot[s] that [were] tested with new technology never seen before." **CAPUCI** further represented that MCC's Trading Bots operated "in very high frequency, being able to do thousands of trades per second," and that each of MCC's Trading Bots (i.e., the "E-Money Trading Bot," "MCC Bot Package," and "Software Trading Bot") would generate daily returns to investors, which ranged between 1% and 3.5% per day.

19.     For example, with MCC's highly touted "E-Money Trading Bot," **LUIZ CARLOS CAPUCI JR.** and his co-conspirators falsely and fraudulently represented that investors could take their earnings from their wallet on MCC's Back Office and transfer their funds to Bitchain Exchanges, a separate platform. MCC falsely and fraudulently represented that Bitchain Exchanges would generate 1% to 1.5% compounded interest each day using a purportedly enhanced trading robot.

20.     Following on the heels of MCC introducing Bitchain Exchanges and the Trading Bots investment option to its investors, in or around 2019, MCC ceased paying investors' returns in Bitcoin, which was the original model. Instead, MCC began distributing returns to investors with Capital Coin, MCC's own cryptocurrency. **LUIZ CARLOS CAPUCI JR.** claimed that

Bitchain Exchanges was the only cryptocurrency exchange that would hold Capital Coin and communicated to investors that they would be able to convert Capital Coin into Bitcoin for transfer to a personal Bitcoin wallet.

21.     In furtherance of the Trading Bots scheme, in or around 2020, **LUIZ CARLOS CAPUCI JR.** also told investors that they were required to pay a $100 "Know Your Customer" fee for each MCC account in order to participate in a "swap" of Capital Coin for Bitcoin on the Bitchain Exchanges platform. **CAPUCI** fraudulently represented that Bitchain Exchanges was not affiliated with MCC when, in fact, **CAPUCI** exercised control over Bitchain Exchanges, including through **CAPUCI's** registration of the Bitchain Exchange's website.

22.     As he did with the Mining Packages, **LUIZ CARLOS CAPUCI JR.** operated an investment scheme with the Trading Bots and was not, as he promised, using MCC Trading Bots to generate income for investors. Instead, **CAPUCI** was falsely and fraudulently diverting investors' funds to cryptocurrency wallets and financial accounts under his control for his own personal use and the use of his co-conspirators.

23.     **LUIZ CARLOS CAPUCI JR.** and CC-1 similarly misled investors regarding investors' purported ability to withdraw their investments at a time of their choosing. MCC's marketing materials stated that "[a]nyone registered by Thursday of every week will be receiving these spectacular bonuses by the following Monday." CC-1 further falsely and fraudulently represented to investors that they could withdraw their MCC funds—referral-related earnings and investor earnings—subject to the following simple rules: (i) a minimum withdrawal value of $300; (ii) withdrawals would be released on the 1st and 15th of each month; and (iii) the investor would receive payment within 7 business days. In truth, however, **CAPUCI** routinely prevented investors from withdrawing funds from their MCC accounts.

**CAPUCI Fabricated His Background and MCC's Purported Business Relationships**

24.     To create the appearance of legitimacy and persuade investors to invest with MCC, **LUIZ CARLOS CAPUCI JR.** fabricated business relationships between MCC and various organizations, and misrepresented various aspects of **CAPUCI's** professional background.

Among other misrepresentations, **CAPUCI** stated the following:

a.     **CAPUCI** falsely and fraudulently represented that MCC used thousands of mining machines and that MCC had partnered with the World Bank to secure an investment in eco-friendly power generators and used wind turbines to power its mining facility.

b.     **CAPUCI** falsely and fraudulently represented that MCC had submitted applications to have Capital Coin, MCC's own cryptocurrency, listed on at least one prominent cryptocurrency exchange.

c.     **CAPUCI** falsely and fraudulently represented that MCC was licensed by the North Carolina Commissioner of Banks as a "Virtual Currency Dealer."

d.     **CAPUCI** falsely and fraudulently represented that MCC had a partnership with the Clinton Foundation, a non-profit organization started by former President William Clinton, so that MCC could help bring schools to children in Africa and share the successes that MCC had enjoyed.

e.     **CAPUCI** falsely and fraudulently represented to investors that he was a former agent with the Federal Bureau of Investigation.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Commit Securities Fraud
### (18 U.S.C. § 371)

1.     The General Allegations section of this Indictment is hereby realleged and incorporated by reference.

2.     From in or around November 2017, and continuing through in or around the date of this Indictment, in Miami-Dade, Broward, and St. Lucie Counties, within the Southern District of Florida and elsewhere, the defendant,

**LUIZ CARLOS CAPUCI, JR.**
a/k/a "Junior,"
a/k/a "Junior Caputti,"
a/k/a "Junior Capuci,"

a/k/a "Capuci,"

did knowingly and willfully combine, conspire, and agree with CC-1 and others known and unknown to the Grand Jury to commit an offense against the United States, namely, securities fraud, that is, to knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes, and artifices to defraud; (ii) making one or more untrue statements of material fact and omit to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in Mining Capital Coin, in connection with the purchase and sale of investments in Mining Capital Coin's Mining Packages, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unjustly enrich themselves by: (a) inducing investors to invest with MCC through materially false and fraudulent pretenses, representations, and promises as to the use of investment funds, the technical abilities of MCC to generate profits through mining operations, cryptocurrency trading and investment activity, and the return on investment on funds invested with MCC; (b) selling unregistered securities to unqualified investors; (c) diverting investors' funds to cryptocurrency wallets and financial accounts under their control; and (d) concealing the misappropriation of investor funds for their own personal use and benefit.

## Manner and Means of the Conspiracy

4.      The allegations contained in the Manner and Means section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the manner and means for this Conspiracy.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its purpose, the defendant, or one of his co-conspirators, committed and caused to be committed in the Southern District of Florida, at least one of the following overt acts, among others:

1.      In or around 2018, **LUIZ CARLOS CAPUCI JR.** offered and sold investment contracts to the public through MCC's offering of Mining Packages.

2.      In or around April 2019, **LUIZ CARLOS CAPUCI JR.** organized an MCC promotional event at a hotel conference room in the Southern District of Florida during which **CAPUCI** falsely and fraudulently described MCC's various investment programs, including its Mining Packages, and falsely and fraudulently represented the profits that prospective investors could earn through investing with MCC.

3.      In or around May 2019, within the Southern District of Florida, **LUIZ CARLOS CAPUCI JR.** showed MCC's purported mining machines at MCC's facility to prospective investors.

4.      In or around July 2019, **LUIZ CARLOS CAPUCI JR.** disseminated a White Paper regarding Capital Coin, MCC's cryptocurrency, to his network of promoters, which falsely characterized the profits MCC earned from its Mining Packages. **CAPUCI** falsely suggested that MCC was the "biggest cryptocurrency mining business in the world."

All in violation of Title 18, United States Code, Section 371.

13

## COUNT 3
### Conspiracy to Commit International Money Laundering
### (18 U.S.C. § 1956(h))

1.      The General Allegations section of this Indictment is hereby realleged and incorporated by reference.

2.      From in or around November 2017, and continuing through in or around the date of this Indictment, in Miami-Dade, Broward, and St. Lucie Counties, within the Southern District of Florida and elsewhere, the defendant,

### LUIZ CARLOS CAPUCI, JR.
#### a/k/a "Junior,"
#### a/k/a "Junior Caputti,"
#### a/k/a "Junior Capuci,"
#### a/k/a "Capuci,"

did knowingly and voluntarily combine, conspire, and agree with CC-1 and others known and unknown to the Grand Jury, to transport, transmit, and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds, from a place in the United States to and through a place outside of the United States, knowing that the monetary instruments and funds involved in such actual and attempted transportation, transmission, and transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of one or more specified unlawful activities, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1956(h).

# FORFEITURE
## (18 U.S.C. §§ 981 and 982)

1.      The allegations of this Indictment are hereby re-alleged and by reference incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **LUIZ CARLOS CAPUCI, JR.,** has an interest.

2.      Upon conviction of a violation of a criminal conspiracy to violate Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant shall forfeit to the United States the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.      Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1) and by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____

FOREPERSON

_____
JUAN ANTONIO GONZALEZ
United States Attorney
Southern District of Florida

JOSEPH S. BEEMSTERBOER
Acting Chief
U.S. Department of Justice
Fraud Section

_____
KEVIN LOWELL
SARA HALLMARK
Trial Attorneys

_____
YISEL VALDES
Assistant United States Attorney
Southern District of Florida

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

LUIZ CARLOS CAPUCI JR.,

_____ Defendant/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

**Court Division:** (Select One)

[✓] Miami  [ ] Key West  [ ] FTL
[ ] WPB  [ ] FTP

New defendant(s) [ ] Yes [ ] No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No**_____

   List language and/or dialect _____

4. This case will take __14__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   I    0 to 5 days        [ ]
   II   6 to 10 days       [ ]
   III  11 to 20 days      [✓]
   IV   21 to 60 days      [ ]
   V    61 days and over   [ ]

   (Check only one)

   Petty         [ ]
   Minor         [ ]
   Misdemeanor   [ ]
   Felony        [✓]

6. Has this case previously been filed in this District Court? (Yes or No) **No**_____

   If yes: Judge _____ Case No. _____

   (Attach copy of dispositive order)

   Has a complaint been filed in this matter? (Yes or No) **No**_____

   If yes: Magistrate Case No. _____

   Related miscellaneous numbers: 22-CV-14129-KMM_____

   Defendant(s) in federal custody as of _____

   Defendant(s) in state custody as of _____

   Rule 20 from the District of Florida_____

   Is this a potential death penalty case? (Yes or No) **No**_____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**_____

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**_____

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**_____

YISEL VALDES
Assistant United States Attorney
Court ID No.    A5502330

\*Penalty Sheet(s) attached

REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** Luiz Carlos Capuci Jr.,aka "Junior," aka "Junior Caputti,"

**Case No:** _____

**Count(s) #:** 1_____

 Consipiracy to Commit Wire Fraud

Title 18, United States Code, Section 1349

**\*Max.Penalty:** 20 Years' Imprisonment

**Count(s)#:** 2_____

 Conspiracy to Commit Securities Fraud

Title 18 United States Code, Section 371

**\*Max.Penalty:** 5 Years' Imprisonment

**Count(s)#:** 3_____

 Conspiracy to Commit Money Laundering

Title 18 United States Code, Section 1956(h)

**\*Max.Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**